## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

_____

In Re:
GERALD G. HALL and
SANDRA L. HALL,

               Debtors.

Bankruptcy Case
No. 11-01506-JDP

_____

## MEMORANDUM OF DECISION
_____

Appearances:

      Joseph M. Meier, COSHO HUMPHREY, LLP, Boise, Idaho, Attorney
for Debtors.

      Judy L. Geier, EVANS KEANE, LLP, Boise, Idaho, Attorney for
Trustee.

### *Introduction*

The debtors in this case, Gerald Gregory Hall and Sandra Hall[1] filed

---

   [1]  Apparently, Mr. Hall has at times used the names "G. Gregory Hall,"
"Gregory Hall," or "Greg Hall".  In this decision, the Court refers to him as
"Hall" individually, and to "Debtors" when referring to both joint debtors
collectively.

MEMORANDUM OF DECISION – 1

a chapter 7[2] bankruptcy petition on May 18, 2011.  Dkt. No. 1.  This

decision addresses the Amended Objection to Debtors' Claims of

Exemption filed in that case by the chapter 7 trustee Richard Crawforth

("Trustee").  Dkt. No. 24.  Debtors responded to this objection on August 3,

2011.  Dkt. No. 31.  The Court conducted an evidentiary hearing

concerning this contested matter on October 18, 2011, and thereafter

invited the parties to submit closing briefs.  Dkt. No. 59.  When the briefing

was complete, the objection was deemed under advisement.

The Court has considered the submissions of the parties, the

testimony presented, the arguments of counsel, as well as the applicable

law.  This Memorandum constitutes the Court's findings of fact,

conclusions of law, and decision resolving the issues.  Fed. R. Bankr. P.

7052; 9014.

### *Facts*

Prior to his bankruptcy, Hall had been engaged in the business of

---

[2]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 – 9037.

MEMORANDUM OF DECISION – 2

real estate development for a number of years.  His business model usually involved the purchase of parcels of real property, to which he and his business partners would add minimal improvements (such as securing plat approval for the property), then selling the lots to another developer for a profit.  Hr'g. Tr., October 18, 2011 ("Tr.") at 122.  It was Hall's practice to create a separate limited liability corporation for each tract of land acquired by him and his partners.  Tr. at 120-21.  Although there were many others, the limited liability companies implicated in this case were Colony Homes, LLC; Canterbury Commons, LLC; and S.B. Development, LLC ("SB Dev.")

Hall's business was successful when the real estate market was booming.  However, when the economy began to sag in 2007, it became significantly more difficult to sell lots.  In response, Hall and his partners elected to change their approach; to make the properties they had acquired more saleable, they erected what Hall referred to as "vertical construction" on the lots.  Tr. at 125-26.  As the Court understands Hall's testimony and this terminology, this means that Hall's companies started building houses

MEMORANDUM OF DECISION – 3

on the lots they owned.  In order to obtain financing for this construction,

the companies had to borrow money, and Hall and his business partners

were asked to guarantee those loans.

In January 2008, Hall, along with others, executed a personal

guarantee with Idaho Independent Bank ("IIB") for a $1.7 million loan

made to SB Dev.  Ex. 9.  According to the promissory note, SB Dev. was

obliged to make monthly payments on the note, with a balloon payment

due  on November 26, 2008.  *Id*.  SB Dev. ultimately defaulted on the  IIB

loan.

Hall also guaranteed two promissory notes executed by Canterbury

Commons in favor of Mountain West Bank ("Mountain West") in the

amounts of $5,000,875 and $1,475,410.  Ex. 115.  It is unclear when Hall

entered into the agreement to personally guarantee the loans, but the loans

were originally entered into on June 28, 2007.  Ex. 115.  Those loans also

eventually went into default.

On May 7, 2008, Hall obtained a personal line of credit from Banner

Bank for $500,000.  Ex. 3.  According to the terms of the Banner Bank note,

MEMORANDUM OF DECISION – 4

all amounts were due and payable on April 30, 2009. *Id*. According to

Hall, the proceeds from the Banner Bank Note were used for business

purposes, to service the various debts upon which he was obligated. Tr. at

130.

With the economy worsening, and given their heavy debt burden,

Debtors made some important decisions concerning their personal

finances. On December 9, 2008, less than two weeks after SB Dev.

defaulted on the loan to IIB, Debtors sold their home located on Holl Drive

in Eagle for $610,000 and received $350,898.17 in cash proceeds from the

sale. Ex. 1. Shortly thereafter, they used $95,000 of those proceeds to

purchase a smaller home located on Seven Oaks Way in Eagle. Tr. at 21-

22. In addition to the making the down payment, Debtors borrowed

$210,000 to buy the Seven Oaks house; this loan required monthly

payments of $1,518.22. Ex 2. Hall testified that he used the remaining cash

from the sale of the Holl Drive home to make an additional capital

investment in Colony Homes, as well as to service debts of the other

entities. Tr. at 22. He did this in an attempt to generate a revenue stream

MEMORANDUM OF DECISION – 5

to service the large amount of debts owed by the companies.  Tr. at 22; 126-27.  This strategy also reduced the amount of Debtors' mortgage payments.  Tr. at 129.

As of January 2009, Debtors' personal assets consisted of their home, three residential rental properties on which they owed more than the value of the properties, each with a negative cash-flow, and a single, bare residential lot in which Debtors owned a one-third interest.  Tr. at 30-32; 43; 152.  Their debts exceeded $16 million.

On February 3, 2009, Hall wrote two checks for $7,000 each payable to Debtors' retirement account at TD AmeriTrade.  Ex 2, check nos. 5071, 5072; Tr. at 33.  The money to cover those two checks was already in Debtors' checking account at the time the checks were written.  Tr. at 34.

A few days later, on February 9, 2009, Hall entered into an agreement to release one of his partners, Scott Stewart, from Stewart's personal guarantee of the $1.7 million loan with IIB.  Ex. 9.  The following day, February 10, 2009, Debtors made their regular monthly mortgage payment of $1,518.22.  Ex 2.  Later that month, on February 25, 2009,

MEMORANDUM OF DECISION – 6

Debtors made an additional $13,674.98 "pre-payment" on their home loan,

this amount representing approximately nine months of mortgage

payments.  Ex. 2; Tr. at 34-35.  Hall testified that, at this time, he knew he

and his wife would not be able to pay the Banner Bank Note when it came

due, and he wanted to ensure that Debtors' home loan payments were

paid in advance.  Tr. at 34-35.

On May 1, 2009, Debtors defaulted on the Banner Bank Note.  Ex. 3,

¶ 9.  On July 10, 2009, Banner Bank sued Debtors in state court; a

judgment was eventually entered against them for approximately $500,000

on March 1, 2010.  Ex 4.

At some point during 2009, Hall testified that he spoke with his

attorney, Mr. Meier, regarding the benefits of filing for  bankruptcy, and

about pre-bankruptcy exemption planning.  Tr. at 50-51.  Also during this

time, Hall had a conversation with his former partner, Stewart, regarding

the purchase of annuities.  Tr. at 44-48; Stewart referred Hall to Gary

Walker, an agent of Lafayette Life Insurance Company.

On October 5, 2009, IIB sent Hall a letter in which it threatened to

MEMORANDUM OF DECISION – 7

sue Debtors for breach of Hall's personal guarantee on the $1.7 million

loan.  Tr. at 70.  On October 29, 2009, Hall wrote himself a check for

$50,000 drawn on the Colony Homes bank account.  Ex. 6, Check No. 2156.

This was done without the knowledge or consent of his partner, Dave

Buich.  Tr. at 55-56.  That same day, Hall unilaterally terminated his

ownership interest in, and resigned all of his management authority over,

each of the entities in which Dave Buich was also involved.  Ex. 5.[3]

On November 4, 2009, Hall signed an application to purchase

Annuity Policy No. 1343 in the amount of $50,000 from Lafayette Life

Insurance Company ("2009 Annuity").  Ex. 8.  The money to purchase the

2009 Annuity came from the funds Hall removed from the Colony Homes

bank account.  Ex. 6, Check No. 2156; Ex. 7, Check No. 5169.  On their

SOFA, Debtors represented that the funds used to purchase the 2009

Annuity were generated from the "proceeds from sale of real property."

Dkt. No. 1, SOFA Question No. 10.

---

[3] Debtors did not disclose this so-called "Termination Agreement" in their
Statement of Financial Affairs ("SOFA") when they filed the bankruptcy case.
Dkt. No. 1.

MEMORANDUM OF DECISION – 8

Shortly after purchasing the 2009 Annuity, Hall became employed by McMillen Engineering, at which employment he worked for about one year.  Tr. at 149.

On March 1, 2010, the same day Banner Bank obtained a money judgment against Debtors, IIB sued Hall and his business partner, Aaron Doughty, to enforce their guarantees.  Ex. 9.  A settlement was ultimately reached in that case on June 9, 2010, when Debtors signed an agreement with IIB in which IIB agreed to release Debtors from the guaranty in exchange for their assignment of all of their membership interests, including rights to payment, in all of their business.  Ex. 113.  As part of the settlement, Debtors executed an Assignment of Distributions, Pledge and Security Agreement, Ex. 113, as well as a Non-Merger Deed in Lieu of Foreclosure on behalf of SB Dev., Ex. 114.  These transfers were not disclosed in Debtors' bankruptcy SOFA.  Dkt. No. 1.[4]

---

[4] It is also unclear whether Hall disclosed to IIB that he had previously terminated his ownership and management interest in a number of business entities, although SB Dev. was not one of the listed entities.  Ex. 5.  Regardless, Hall's disclosures to IIB are not relevant to the issues at hand.

MEMORANDUM OF DECISION – 9

Hall continued his ongoing efforts to settle his remaining debts.  In July 2010, Debtors executed a Settlement Agreement with Mountain West. Ex. 115.  In it, the bank agreed to release Debtors from their guarantee obligations in exchange for delivery of a deed in lieu of foreclosure on the property securing loans from Mountain West to Canterbury Commons. Ex. 115.  Hall also agreed to pay Mountain West $5,200.  *Id*.  These transfers were likewise not disclosed in Debtors' SOFA.  Dkt. No. 1.

In September or October 2010, Hall was informed by his accountant that Debtors may qualify for a 2009 tax refund for carry-back losses arising from their various business ventures.  Tr. at 74.  They filed their tax return on October 6, 2010.  Ex. 104.  In doing so, Debtors were aware that if the Internal Revenue Service ("IRS") accepted their 2009 tax return as filed, they would receive a refund in the amount of $53,135.

On November 24, 2010, the Halls were served with a Second Order for Examination of Defendant by Banner Bank.[5]  Ex 12.  The Order

---

[5]  Debtors had been ordered to appear at an earlier debtor's examination, but they did not receive notice of that examination, and failed to appear.

MEMORANDUM OF DECISION – 10

commanded that Hall appear for examination on December 10, 2010, and

that he bring with him specific information and documentation concerning

Debtors' finances and assets, including a copy of their 2009 federal tax

return.  *Id*.  During the debtor's examination, when Hall was asked by the

bank's attorney for copies of his 2009 tax returns, he indicated that he had

not brought copies with him because he had been advised by his attorney

to bring only a recent financial statement.  Ex. 13 at p. 6.  Further, when

Hall was asked whether he could think of anyone who owed him money

for any reason, he responded in the negative; he did not volunteer any

information regarding the potential $53,000 income tax refund.  Ex. 13 at p.

28.  At the hearing on this matter, Hall clarified that he discussed with his

state court counsel, Mr. McColl, whether to bring his 2009 federal tax

returns to the examination, but had decided against it as Debtors were

unsure whether the Internal Revenue Service would accept the return as

filed.  Hall followed his counsel's advice to respond truthfully to the

questions asked.  As a result, since he was not asked specific questions

about the tax refund, in Hall's opinion, he did not need to volunteer the

MEMORANDUM OF DECISION – 11

information.

Debtors continued in their efforts to settle the remaining business debt. On January 19, 2011, Debtors, through counsel, sent offers to both Banner Bank and Washington Trust to settle their debts to each bank for a total of $20,000, to be paid over five years, or via a lump sum payment of $10,000. Exs. 19, 20. Banner Bank apparently rejected the offer within a couple of weeks. Tr. at 178-79.

On February 7, 2011, Debtors received a tax refund check in the amount of $53,135.[6] Ex. 14. That same day, they deposited the check in a bank account belonging to Mary Faddis, Hall's mother-in-law. *Id.* The following day, February 8, 2011, Faddis purchased a cashier's check payable to Lafayette Life Insurance Company in the amount of $45,000, which Debtors used to purchase a second annuity from Lafayette Life Insurance Company, Policy No. 3181 ("2011 Annuity"). Exs. 14; 15.

On May 18, 2011, Debtors filed their bankruptcy petition. Dkt. No.

---

[6] While the check itself is dated February 4, 2011, Hall testified that they actually received the check on February 7, 2011. Tr. at 163.

MEMORANDUM OF DECISION – 12

1.  On schedule B, Debtors disclosed that they owned two annuities with unknown values, as well as four retirement accounts with a combined value of $78,098.60.  *Id*.  On their schedule C, Debtors claimed an exemption for 100% of the value of both annuities pursuant to Idaho Code § 41-1836(1)(b).  They claimed an exemption in the four retirement accounts pursuant to Idaho Code § 11-604A.  *Id*.  In their SOFA, responding to Question 10, Debtors indicated that the 2011 Annuity was funded with "$45,000 from tax refund," and the 2009 Annuity was funded with "$50,000 from proceeds from sale of real property."  *Id*.

On July 7, 2011, Trustee timely objected to the Debtors' claims of exemption in both the annuities and all of the retirement accounts.  Trustee alleged that Hall purchased the annuities "with the intent to shelter the funds and to defraud creditors, which does not qualify as a proper purpose pursuant to Idaho Code § 41-1836(1)(b)."  Dkt. No. 23.  On August 3, 2011, Debtors filed a Reply to Trustee's Objection to Debtors' Claims of Exemption, Dkt. No. 31, and requested a hearing, Dkt. No. 32.

Hall submitted to a Rule 2004 examination on August 18, 2011.  Dkt.

MEMORANDUM OF DECISION – 13

No. 28.  Trustee thereafter withdrew his objection to Debtors' claims of

exemption in the retirement accounts.  Dkt. No. 48.  The Court conducted

an evidentiary hearing on Trustee's objection to Debtors' claims of

exemption as to the two annuities on October 18, 2011.  Dkt. No. 59.  On

the morning of the hearing, Debtors voluntarily withdrew their claim of

exemption as to the 2011 Annuity, leaving only the exemption in the 2009

Annuity at issue.  Dkt. No. 62.

*Discussion*

*A.  Exemption Law*

As is well-understood, when a bankruptcy petition is filed, a

bankruptcy estate is automatically created, into which flows all legal and

equitable interests which Debtors have in property, as of the

commencement of the case.  § 541(a).  The Code permits Debtors to shield

certain property from administration by Trustee, through the use of

exemptions.  § 522(b)(1).  While the Code contains a list of property which

may be claimed as exempt, it also allows states to opt out of the federal

exemption scheme in favor of its own.  §522(b)(3).  Idaho has chosen to opt

MEMORANDUM OF DECISION – 14

out, and thus debtors in this state may claim only those exemptions

allowable under Idaho law, as well as those listed in § 522(b)(3).  Idaho

Code § 11-609; 11 U.S.C. § 522(b)(3).

As the objecting party, Trustee bears the burden of proving that

Debtors' claim of exemption is not proper.  Rule 4003(c).  Once the Trustee

presents "sufficient evidence to rebut the prima facie validity of the

exemption, the burden shifts to a debtor to demonstrate that the

exemption is proper."  *In re Wilcox*, 08.1 IBCR 13, 14 (Bankr. D. Idaho 2008)

(quoting *In re Hess*, 350 B.R. 882, 885 (Bankr. D. Idaho 2005)).  In Idaho,

exemption statutes are liberally construed in favor of the debtor.  *In re*

*Moore*, 05.3 I.B.C.R. 51, 51 (Bankr. D. Idaho 2005) (citing *In re Duman*, 00.3

I.B.C.R. 137, 137 (Bankr. D. Idaho 2000)).

Idaho law provides that any annuity payments, or prospective

payments, are exempt up to a maximum of $1,250 per month.  Idaho Code

§ 41-1836.  The statute provides in relevant part:

> The benefits, rights, privileges and options which
> under any annuity contract heretofore or
> hereafter issued are due or prospectively due the

MEMORANDUM OF DECISION – 15

annuitant, shall not be subject to execution nor
shall the annuitant be compelled to exercise any
such rights, powers, or options, nor shall
creditors be allowed to interfere with or terminate
the contract, *except:*

> *(a) As to amounts paid for or as a premium on
> any such annuity with intent to defraud
> creditors, with interest thereon,* and of which
> the creditor has given the insurer written
> notice at its home office prior to the making
> of the payments to the annuitant out of
> which the creditor seeks to recover.  Any
> such notice shall specify the amount
> claimed or such facts as will enable the
> insurer to ascertain such amount, and shall
> set forth such facts as will enable the
> insurer to ascertain the annuity contract,
> the annuitant and the payments sought to
> be avoided on the ground of fraud.

Idaho Code § 41-1836 (emphasis added).

In this case, Trustee argues that the amounts paid by Debtors as the

premium for the 2009 Annuity[7] are not exempt because Debtors intended to

---

[7] Trustee has not questioned whether the 2009 Annuity for purposes of
the exemption statute, and the Court expresses no opinion in that regard.

MEMORANDUM OF DECISION – 16

defraud their creditors via the purchase.[8]  This is, necessarily, a factual

determination.  *See* Idaho Code § 55-908.

### B. Intention to Defraud Creditors

The law tolerates a certain amount of pre-bankruptcy exemption

planning.  In other words, it is not *per se* fraudulent for a debtor to convert

nonexempt property to exempt property on the eve of a bankruptcy filing.

*See, e.g., In re Daniel*, 771 F.2d 1352, 1358 (9th Cir. 1985); *In re Ganier*, 403 B.R.

79, 84 (Bankr. D. Idaho 2009); *Fitzgerald v. Hawkins (In re Hawkins)*, 91 IBCR

54, 54 (Bankr. D. Idaho 1991).

However, as this Court has noted, "[f]acts matter," and while the

"prebankruptcy conversion of non-exempt assets to exempt assets is not *per

se* fraudulent, [ ] neither is it *per se* proper and insulated from scrutiny and

possible avoidance.  There is no absolute safe harbor for bankruptcy

---

[8]  As can be seen, a determination of whether an annuity contract was purchased with intent to defraud creditors is required as a condition of the to determining the validity of the exemption under the plain language of Idaho Code § 41-1836(a).  Therefore, when an annuity is at issue, it is proper for a trustee rely upon a debtor's fraudulent intent in connection with an objection to claim of exemption, rather than by some other motion.

MEMORANDUM OF DECISION – 17

exemption planning." *In re Ganier*, 403 B.R. at 85. Proof of fraudulent intent must be made by a preponderance of the evidence. *Gill v. Stern (In re Stern)*, 345 F.3d 1036, 1043 (9th Cir. 1993).

As the annuity exemption statute is one provided by state law, its interpretation is likewise governed by state law. *In re Hawkins*, 91 IBCR at 54-55. Because direct evidence of fraudulent intent is generally unavailable, Idaho courts have held that its existence "may be inferred from the presence of certain indicia of fraud or 'badges of fraud.'" *DBSI/TRI V v. Bender*, 948 P.2d 151, 162 (Idaho 1997); *see also* Idaho Code § 55-913(2) (Idaho's Uniform Fraudulent Transfer Act provides a non-exhaustive list of factors to consider which evidence an indicia of fraudulent intent). Because of the similarity in the language employed by the Idaho Legislature in both the Uniform Fraudulent Transfer Act and the statute governing the exemption of annuities, as well as both laws' purposes (*i.e.* protecting creditors from fraudulent conduct by a debtor), the Court in this case is informed by the list of factors provided in Idaho Code § 55-913(2) for guidance in deciding whether so-called "badges of fraud"

MEMORANDUM OF DECISION – 18

are present in this case.  Those factors direct the Court to consider whether:

> (a) The transfer or obligation was to an insider;
> (b) The debtor retained possession or control of the property transferred after the transfer;
> (c) The transfer or obligation was disclosed or concealed;
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (e) The transfer was of substantially all the debtor's assets;
> (f) The debtor [absconded];
> (g) The debtor removed or concealed assets;
> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Idaho Code § 55-913(2).

Considering those factors in light of the facts surrounding the transfer by Debtors to purchase the 2009 Annuity, it is clear that several badges of fraud are present.

1.  Lawsuits.

MEMORANDUM OF DECISION – 19

First, Debtors had been both sued, and threatened with suit, when

they purchased the 2009 Annuity.  Shortly before his purchase of the 2009

Annuity, Banner Bank had filed an action against Hall to collect the debts

he had guaranteed.  Hall received IIB's demand letter only one month prior

to the purchase of the annuity.  This factor suggests fraud is present under

these facts.

2.  Transfer of Substantially All Assets.

A second badge of fraud is also evidenced here.  Hall's testimony at

the hearing made it clear that, when he purchased the 2011 Annuity, he

took what was basically Debtors' only cash asset, the tax refund, and

transferred it beyond the reach of his creditors.  To a somewhat lesser

degree, the same can be said as to both the purchase of the 2009 Annuity, as

well as the distribution of the proceeds from the January 2009 sale of their

home.

For the 2009 Annuity, Hall took $50,000 from the Colony Homes

bank account, and invested it in the annuity.  While Hall considered that

money a withdrawal of a portion of his investment in Colony Homes, it is

MEMORANDUM OF DECISION – 20

debatable whether Hall had any legal basis to access those funds.  He admittedly withdrew the funds without his partner's knowledge or consent, and moreover, he used this money to purchase the 2009 Annuity, rather than pay his creditors.

Hall's disbursement of the home sale proceeds is also somewhat equivocal as to this particular badge of fraud.  It is true that Debtors sold their home and utilized $95,000 as a down payment on a new home, which equity would certainly be protected under Idaho's homestead statute.  On the other hand, they took the remaining approximately $250,000 and reinvested it into Colony Homes.  It was Hall's testimony that this was done to fund "vertical construction" in the hopes of generating a revenue stream by which he and his partners could service their debts; nevertheless, this act put funds out of creditors' hands.  Moreover, Hall could still access the money, so perhaps it had not been spent on "vertical construction" after all.  In sum, Debtors converted less than one third of the sale proceeds to non-exempt assets.

    3.  Debtors' Insolvency at the Time of Transfer.

MEMORANDUM OF DECISION – 21

This is a third badge of fraud clearly present in this case.  At the time
Debtors sold their home in January 2009, as well as when they purchased
the 2009 Annuity in November, they were directly obligated on the note
with Banner Bank, and on their personal guarantees with IIB, Washington
Trust and Mountain West, in an amount over $16 million.  And, while the
exact value of the tracts of land owned by the various companies was not
demonstrated at the hearing, it was clear that the value of these properties
had markedly declined in relation to their purchase prices, and that no
buyers could be found for the properties.  Thus, Debtors' debts were far
greater than their assets.  Moreover, Debtors were in default on all of their
business loans, and thus were not generally paying debts as they came due.
The Court finds that Debtors were insolvent at the time the 2009 Annuity
was purchased.

    4.  Concealment of the Transfers.

Trustee alleges that Debtors concealed the receipt of the tax refunds
as well as made several omissions on their SOFA.  The Court agrees that at
the judgment debtor's examination, Hall intentionally decided not to

MEMORANDUM OF DECISION – 22

divulge that Debtors had filed a tax return which, if accepted by the

Internal Revenue Service, would have entitled Debtors to receive a $53,000

refund.

In addition, Debtors made several omissions on their bankruptcy

SOFA. First, they indicated that the 2009 Annuity was funded from the

proceeds from the sale of real property, which was, at best, only indirectly

true. Second, they did not disclose that they had paid $5,200 to settle with

Mountain West. Lastly, they also did not list the settlement with IIB, which

included signing an Assignment of Distributions, Pledge and Security

Agreement, thus divesting Hall of his interest in SB Dev., among other

entities. In sum, because of their failure to disclose these and other

transactions, the Court may infer that Debtors were attempting to conceal

assets.

Based upon the presence of several badges of fraud in this case, the

burden shifts to Debtors to show that the claim of exemption is proper, and

that their purchase of the 2009 Annuity was not done with intent to defraud

their creditors.

MEMORANDUM OF DECISION – 23

*C. Mitigating Factors*

Through the evidence and testimony presented, Debtors have attempted to mitigate the fraud evidence presented by Trustee. The Court will briefly review this evidence.

1.  Debtors' Decision to Purchase Annuities.

The evidence shows that Debtors' choice to convert their cash assets to annuities was not accidental. Hall spoke with others similarly engaged in financially challenged real estate ventures, and learned about asset protection using annuities.

On the other hand, Hall testified credibly that he was unemployed at the time he purchased both the 2009 and 2011 Annuities. Because he had no other reliable source, an annuity would conceivably provide a regular source of income to pay basic expenses, which Hall would otherwise be unable to access to service debt. In this regard, the Court is mindful that Congress drafted the Code to include exemptions in order to facilitate a debtor's fresh start, and that Debtors ought to be able to make full use of those available exemptions. *Cirilli v. Bronk (In re Bronk)*, 444 B.R. 902, 915

MEMORANDUM OF DECISION – 24

(Bankr. W.D. Wis. 2011).

     2.  <u>Settlement of Business Debt</u>.

     The Court also finds credible Hall's testimony that he sincerely believed in 2009 that he could settle most, if not all, his business debts.  As it turned out, through lengthy negotiations, Hall was able to extricate himself from many millions of dollars in debt on the personal guarantees he had given to IIB and Mountain West under agreements requiring only a cash payment of $5,200 to Mountain West.

     3.  <u>Tax Refund</u>.

     When it comes to Debtors' use of the income tax refund to purchase an annuity, as opposed to using the money to settle with Banner Bank, the Court is less convinced about Debtors' motives.  The evidence indicates that, at the time the refund check arrived, Banner Bank held a large money judgment against Debtors and was attempting to collect it.  There is no question Hall understood that, if he deposited the refund monies in his personal account, Banner Bank might seize them.  The Court believes Debtors' testimony that their bank would not immediately issue a cashier's

MEMORANDUM OF DECISION – 25

check upon deposit of the tax refund check.  However, the Court also

perceives that Debtors did not want to let the $53,000 rest in their account

for long.  Thus, they utilized Hall's mother-in-law's bank account to ensure

their immediate access to the funds, and the next day they funneled those

funds into an exempt asset – the 2011 Annuity.

In response to questioning about why he did not offer the $50,000

from the tax refund to Banner Bank in settlement of the note, Hall testified

he did not believe that $50,000 would buy him a settlement with Banner

Bank.  Tr. at 167.  Therefore, Hall says he invested the money in the 2011

Annuity, and believed he could use the equity in his home to fund a

settlement, assuming one could be negotiated.  The Court views this

explanation for Debtors' conduct with suspicion.

First, Hall had testified at the Rule 2004 examination that he wanted

to use the tax refund monies to settle with the remaining banks; thus, his

testimony is inconsistent on this issue.  Tr. at 176-77; 178.  Second, if

settlement was truly Debtors' aim, why would it make sense to make

$50,000 unavailable to fund a settlement by putting it out of reach of both

MEMORANDUM OF DECISION – 26

Debtors and their creditors?  Doing so not only decreased the amount they

could offer in settlement by $50,000, but would also force them to tap the

equity in their home to make a deal with the bank.

Hall's testimony surrounding the non-disclosure of the potential tax

refund at the judgment debtor's exam is believable.  While perhaps bad

advice, Hall followed the instructions of his counsel in not bringing the

2009 tax return to the examination, even though directed to do so by the

state court's order.  Moreover, his counsel gave him verbal directions on

how the debtor's examination would proceed, including explaining that he

would be asked directly about the tax refund.  As the questioning

proceeded along the lines his counsel had predicted, Hall waited for a

question about the amount of his 2009 tax refund.  However, the question

never came, and so he never provided that information to the bank's

lawyer.  While he almost certainly would have been asked questions about

the status of any refund had he provided the 2009 return as he was

supposed to, the bank's attorney never asked him about any refund.  The

Court is satisfied with Hall's explanation on his failure to volunteer that

MEMORANDUM OF DECISION – 27

information.

### 4.  Withdrawal of Colony Homes Funds.

Trustee attempts to make much of the fact that Hall withdrew

$50,000 from the Colony Homes business without his partner, Dave Buich's

knowledge, immediately prior to Hall's termination of his association with

Buich.  However, the Court does not view this as a sinister act as does

Trustee.

Recall, when Debtors sold their home, they took approximately

$200,000 to $250,000 of the proceeds generated from that sale, and invested

them into Colony Homes.  As time progressed, Hall became disenchanted

with Buich as a business partner, and ultimately elected to sever the

relationship.  Removing himself from that business, Hall sought to recoup a

fraction of the home sale proceeds he had infused recently in the venture.

The Court believes him when Hall testified that he thought he was "taking

back" a share of his investment as he retreated from the business.  But

regardless of the propriety of that maneuver, legally or otherwise, Trustee's

suggestion that Hall essentially stole operating capital from the business

MEMORANDUM OF DECISION – 28

and converted it to his own use is not supported by the evidence.

    5.  Errors and Omissions on Debtors' SOFA.

    The Court finds the omissions on Debtors' SOFA to be adequately

explained.  First, Hall testified credibly that he did not list the $5,200

payment to Mountain West in response to Question 10, because the

question asks only for transfers "other than property transferred in the

ordinary course of the business," and Hall felt that this was payment on a

business debt.  Likewise, he did not list the assignment that he signed in

favor of IIB because he believed it to be valueless.  While he acknowledged,

that the SOFA should be amended to include this transfer, Hall felt it had

no bearing on his creditors.  While the Court agrees that the SOFA should

be amended to include this transfer, the Court also accepts Hall's

explanation and finds nothing sinister afoot with regard to this omission.

### *Disposition*

    In determining whether there was intent to defraud, the focus is on

the intent of the transferor.  *Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221,

235 (9th Cir. BAP 2007).  With regard to the indicia of fraud,

MEMORANDUM OF DECISION – 29

> [n]o minimum number of factors tips the scales
> toward actual intent.  A trier of fact is entitled to
> find actual intent based on the evidence in the
> case, even if no "badges of fraud" are present.
> Conversely, specific evidence may negate an
> inference of fraud notwithstanding the presence of
> a number of "badges of fraud."

*In re Beverly*, 374 B.R. at 236.

The Court considers this to be a very close call.  There is no question that Debtors converted non-exempt assets to exempt assets at a time they were in financial peril, facing threats and lawsuits from lenders.  In addition, portions of Hall's testimony have not always been consistent, nor has he been completely forthright about the facts at times.

Nevertheless, the Court finds that Debtors honestly hoped they could settle their debts without the use of the funds they converted to exempt assets.  In large part, they did so successfully.  As the *In re Beverly* court noted, "it is difficult to draw the line between legitimate bankruptcy planning and intent to defraud creditors . . . ."  However, two things are certain:  first, there must be evidence beyond the mere timing of the conversion of property from non-exempt to exempt in order to show fraud

MEMORANDUM OF DECISION – 30

by a debtor; and second, cases finding an intent to defraud typically "involve some combination of large claims of exemption and overtones of overreaching."  374 B.R. at 245.

Here, with the exception of the 2011 Annuity, it cannot necessarily be said that Debtors converted non-exempt property to exempt property on the eve of bankruptcy.  The sale of the home, and the purchase of the 2009 Annuity shortly thereafter using a portion of the proceeds, occurred eighteen months or so *before* Debtors filed their bankruptcy petition. However, Debtors' acquisition of the 2011 Annuity was just a few months before the bankruptcy filing.

With regard to a combination of large claims of exemption and overreaching, that is not present here.  Recall, at one time, Debtors owed in excess of $15 million in debts.  Realistically, nothing they owned by way of personal assets would come even close to paying that amount of debt. Rather, Debtors guaranteed themselves a relatively minimal stream of income through their investments, and then bargained with their biggest playing cards:  the parcels of real property.

MEMORANDUM OF DECISION – 31

### *Conclusion*

Though this is a close case, the Court finds, on balance, that Trustee has not demonstrated by a preponderance of the evidence that Debtors wilfully intended to defraud their creditors by converting non-exempt assets to a potentially exempt annuity in 2009.  The Code provides Debtors the right to a financial fresh start, and Debtors actively took advantage of that right.

Trustee's objection to Debtors' claim of exemption regarding the 2009 Annuity will be denied by separate order.

Dated:  January 6, 2012

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION – 32